UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MITCHELL LIPSKY,**

    Plaintiff,

  v.                                                    Case No. 18-CV-899

**MICHELS CORPORATION,**

    Defendant.

---

### DECISION AND ORDER ON DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

---

Mitchell Lipsky sues his former employer, Michels Corporation, for age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et. seq*. Lipsky alleges that he was terminated from his employment because of his age. Michels moves for summary judgment dismissing Lipsky's complaint. For the reasons explained in this decision, Michels' motion is denied.

### FACTS

Lipsky was born on December 3, 1954 (Compl. ¶ 7, Docket # 1 and Answer ¶ 7, Docket # 8) making him 59 years old when he began working for Michels in March 2014. Michels is a company engaged in utility and infrastructure construction. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 27 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.) ¶ 1, Docket # 35.) Lipsky was hired by Michels in March 2014 as a general superintendent in Michels' tunneling division. (Declaration of Michael Yellin ("Yellin Decl.") ¶ 3, Deposition of Mitchell Lipsky ("Lipsky Dep.") at 189–90, Ex. 1, Docket # 28-1.) Lipsky was recommended for the Michels job by Jim Stevens, with whom Lipsky had previously

worked on a project while they were both with different companies. (Lipsky Dep. at 17–18, 192–93.) Lipsky's job required him to travel around the United States to direct large-scale excavation and installation projects and Lipsky was responsible for leading many project-related activities including, but not limited to, resource planning, materials management, quality control, and expense tracking. (Compl. ¶¶ 9–10 and Answer ¶¶ 9–10.) In 2014, the same year he was hired by Michels, Lipsky was promoted to deputy project manager on a project in California. (Lipsky Dep. at 191.)

In 2017, Lipsky worked on several projects for Michels in New York. (*Id.* at 201.) Lipsky does not allege that he was discriminated against prior to January 2017 (*id.* at 74) and alleges that only two people discriminated against him in the course of his employment with Michels—Troy Graham and Mark Ballard (*id.* at 28). On the Long Island Project, Lipsky worked as assistant project manager and on the Middletown Project, he worked as superintendent. (*Id.*) While on the Middleton Project, Lipsky's manager was Troy Graham—the general superintendent. (*Id.* at 202.) Graham reported to Craig Vandaelle and Brenden Tippets. (*Id.*) While working on the Middleton Project, Lipsky testified that Graham told him that "perhaps [Lipsky] should think about retiring" and "perhaps [Lipsky] was too old for this kind of work." (*Id.* at 28.)

Around August 2017, Lipsky began working on Michels' Ohio Project. (DPFOF ¶ 12 and Pl.'s Resp. ¶ 12.) The Ohio Project involved constructing sewer tunnels, which required the construction of ten vertical shafts to provide underground access to complete the tunneling work and install the sewer piping. (*Id.* ¶ 13.) It was during this project that Lipsky alleges that the majority of the alleged discrimination took place. The hierarchy of the Ohio Project was as follows: Vandaelle was the general manager of Michels' Tunneling

Division for the United States and Stevens was Vandaelle's senior advisor. (*Id.* ¶¶ 15–16.) Vandaelle had four direct reports on the Ohio Project—Tippets (micro-tunnel manager), Graham (general superintendent), Kit Fleming (operations manager), and Lloyd Maier (tunnel manager). (*Id.* ¶ 20.) Jim Mantes was the project manager for the Ohio Project and reported to Tippets. (*Id.* ¶¶ 36, 39.) Mark Ballard was a superintendent on the Ohio Project, was in charge of the micro-tunneling work, and reported to Graham. (*Id.* ¶¶ 29–31.) Ballard is completely deaf and communicated on the job site by speaking and writing notes and emails. (*Id.* ¶ 34.) Lipsky found it very difficult to understand Ballard's "very slurred" speech. (*Id.* ¶ 35.)

Based on Lipsky's shaft experience and performance on a previous project, Graham requested that Vandaelle and Tippets assign Lipsky to the Ohio Project. (*Id.* ¶ 25.) Lipsky was the shaft superintendent on the Ohio Project and was responsible for developing the site and constructing the shafts to allow the micro-tunneling group to get underground to complete the tunneling work on the sewer. (*Id.* ¶¶ 26–27.) Lipsky initially reported to Graham. (*Id.* ¶ 28.)

While working on the Ohio Project, Lipsky testified that Graham approached him many times asking Lipsky if he was going to retire and asking how old he was. (Lipsky Dep. at 28.) Lipsky further testified that Graham continued to ask him: "Don't you think you're too old for this kind of work?" (*Id.* at 29.) Lipsky testified that Graham would say things to him like "hey, old man" and "how long are you going to keep doing this for?" (*Id.* at 32–33.) Lipsky further testified that while on the Ohio Project, Ballard would tell Lipsky that he was "just too fuckin' old," state he was an "old man," and say things like "don't you think

3

you're a little bit old to be doing this now?" and "have you thought about retiring?" (*Id.* at 42–49.)

On October 5, 2017, field engineer Hannah Jost sent an email to Lipsky and Mantes expressing concern that Lipsky spoke to her in a disrespectful manner when she was trying to confirm that the crew had the equipment that they needed to do the work. (DPFOF ¶ 43 and Pl.'s Resp. ¶ 43.) Mantes forwarded this email to Tippets, who forwarded it to Vandaelle and Maier for discussion. (*Id.* ¶ 44.) Vandaelle testified that he received some complaints that Lipsky was not meeting production from his direct reports on location. (Yellin Decl. ¶ 7, Deposition of Craig Vandaelle ("Vandaelle Dep.") at 18, Ex. 5, Docket # 28-5.) Vandaelle stated that he sent Graham out a "couple times to meet with him to see what we could do to change that." (*Id.*) Graham testified that Mantes called him out to the job site on two different occasions concerning Lipsky's unwillingness to cooperate and follow his orders. (Yellin Decl. ¶ 3, Deposition of Troy Graham ("Graham Dep.") at 30–33, Ex. 3, Docket # 28-3.) Graham testified that he spoke to Lipsky and told him that he needed to cooperate and follow Mantes' directions. (*Id.* at 37.) On October 25, 2017, Lipsky received an employee disciplinary report, stating that he was "not communicating with job management, office personnel or senior management, does not like to be questioned on means and methods or justify his decisions by answering questions." (Declaration of Craig Vandaelle ("Vandaelle Decl.") ¶ 13, Ex. 1, Docket # 30-1.) Lipsky disagreed with the allegations and refused to sign the report. (Lipsky Dep. at 236–37.) After Lipsky's alleged performance issues were discussed with him on October 25, 2017, Graham told Lipsky that he would be reporting to Ballard. (Lipsky Dep. at 143.)

A series of emails were sent in early November 2017 between Michels' management members about Lipsky. While Lipsky disputes the validity of the complaints expressed in the emails, he does not dispute that the emails were sent. (Pl.'s Resp. to DPFOF ¶¶ 55–63.) On November 1, 2017, Ballard sent Lipsky an email, copying Mantes and the project engineers, identifying a number of open tasks, requesting that Lipsky complete a "short form" planning document to help plan the work and get the proper equipment, requesting that Lipsky spend more time in the office planning the work, and explaining that Lipsky needed to "let the foreman do the job." (DPFOF ¶ 55 and Pl.'s Resp. ¶ 55.) Lipsky testified that he discussed Ballard's email with Mantes and told him that he would "try to work through it and keep production up." (Lipsky Dep. at 249.) The next day, Mantes sent Lipsky a follow-up email asking about the progress of the short form planning documents and explaining: "The importance of this one page planning form is to document a work plan for the upcoming operations so everyone understands what is going on and the materials and equipment needed show up on time. Please take some time to complete this task. Help us, help you." (DPFOF ¶ 58 and Pl.'s Resp. ¶ 58.) Also on November 2, 2017, Ballard forwarded Vandaelle a photograph of Lipsky in the shaft, explaining that he had been telling Lipsky to perform as a superintendent, not a foreman. (*Id.* ¶ 60.) Vandaelle forwarded this email to Stevens, Fleming, Tippets, Maier, and Graham, explaining that Lipsky "is not letting the foreman do his job" and that "this is happening a lot." (*Id.* ¶ 61.)

On November 3, 2017, Mantes, Lipsky, and Ballard had an email exchange about the timely ordering of equipment in which Ballard again outlined problems with Lipsky requesting improper equipment in an untimely fashion and again explained to Lipsky the importance of planning his work in advance. (*Id.* ¶ 62.) Mantes further discussed the

5

October 25, 2017 disciplinary report with Lipsky on November 8, 2017 and forwarded the report to Graham, Vandaelle, Tippets, and Maier. (*Id.* ¶ 64.)

Sometime after, Lipsky testified that Graham gave him an "ultimatum" that if he did not want to retire he had to go to a job in Texas in ten days. (Lipsky Dep. at 29.) Lipsky testified that on November 27, 2017, the day he was terminated from Michels, Graham called him a "fucking old miner." (*Id.* at 164.) While Vandaelle made the final decision to terminate Lipsky's employment (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 88, Docket # 34), Vandaelle noted that he received input and information from Graham, Mantes, Maier, Tippets, and Stevens and that it was a "unanimous decision" among them to fire Lipsky (Vandaelle Dep. at 59–65). Vandaelle testified that while he was aware of and considered Ballard's concerns about Lipsky's performance, he did not seek input from Ballard regarding Lipsky's continued employment nor did Ballard's complaints constitute the primary reason for Lipsky's termination. (*Id.* at 56–57, 63–65.) Vandaelle testified that Lipsky was terminated because his crew was inefficient and his production rates were not being met. (Vandaelle Dep. at 59–60.) Lipsky was replaced by Dino Emerson on the Ohio Project, whose date of birth is February 11, 1962—making him 55 years old at the time of hire. (DPFOF ¶¶ 111, 114.)

**SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**ANALYSIS**

The ADEA makes it unlawful for employers to take adverse employment actions against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a), 631(a). "By its terms the ADEA proscribes disparate treatment, where 'liability depends on whether the protected trait . . . actually motivated the employer's [adverse] decision.'" *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 532 (7th Cir. 2017) (quoting *Hazen Paper Co. v.*

*Biggins*, 507 U.S. 604, 610 (1993)). Thus, unlike Title VII which protects against mixed-motive discrimination, to prevail under an ADEA claim, a plaintiff must prove that age was the "but-for" cause of the adverse employment action. *Id.*

An ADEA plaintiff may proceed by introducing direct or circumstantial evidence that his employer took an adverse action against him because of his age. *Id.* at 532–33. Alternatively, a plaintiff may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the burden-shifting approach, the plaintiff must come forward with evidence showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Id.* at 533 (quoting *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the plaintiff has established this *prima facie case*, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (citation omitted). Howsoever the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of his age. *Id.* (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Although Lipsky argues that Michels is not entitled to summary judgment under either the direct or the burden-shifting approach, I find it unnecessary to analyze the evidence under the burden-shifting approach because Lipsky presents direct evidence that if credited by a jury, could establish age discrimination. Specifically, Lipsky claims that

8

Graham and Ballard, two alleged decision-makers, uttered statements demonstrating discriminatory animus toward him. Thus, whether summary judgment is appropriate turns on two questions: (1) were Graham and Ballard decision-makers in Lipsky's termination? and (2) were they motivated by age animus? As to the first question, there is a dispute of fact over who was involved in the decision to fire Lipsky. The parties spend much time arguing whether Graham and/or Ballard influenced Vandaelle's decision under a "cat's paw" theory. But this analysis is also unnecessary. A "cat's paw" theory is used when a non decision-making co-worker who harbors impermissible bias infects the decision-maker's employment decision. *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379–80 (7th Cir. 2011). The idea behind the theory is that an "unwitting manager or supervisor [ ] is persuaded to act based on another's illegal bias." *Id.* at 379.

But the evidence presented in this case is different. While Vandaelle made the ultimate decision to terminate Lipsky's employment, (PPFOF ¶ 88), he was not the only deicison-maker. A decision-maker is someone who is involved in the process of making the employment decision at issue. *See, e.g.*, *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007); *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005); *Testerman v. EDS Tech. Prod. Corp.*, 98 F.3d 297, 301 (7th Cir. 1996). Vandaelle testified that he received input and information from Graham, Mantes, Maier, Tippets, and Stevens. (Vandaelle Dep. at 59–65.) He testified that he had a conference call with those individuals and it was "a unanimous decision to let [Lipsky] go. Each of my direct reports provided insight and their opinion on the situation." (*Id.* at 61.) Graham himself testified that he was involved in the decision to fire Lipsky, that he recommended his termination, and that the decision to fire

9

Lipsky was a "group decision." (Graham Dep. at 27.) Thus, the evidence supports that Graham himself was a decision-maker in the decision to fire Lipsky.

As to Ballard, Vandaelle testified that he did not seek his input regarding Lipsky's termination. (Vandaelle Dep. at 57.) In contrast, Lipsky testified that when Stevens told him that he was being terminated, Stevens stated that a "vote" was taken and Graham, Ballard, Maier, Vandaelle, and Fleming were part of the vote to fire him. (Lipsky Dep. at 21–23, 174.)[1] Drawing all inferences in a light most favorable to Lipsky, as I must, a reasonable jury could find that although Vandaelle may have made the final decision, Ballard also played a role in the decision to terminate Lipsky.

Again, Lipsky reported to both Graham and Ballard at various points during his employment with Michels. Graham testified that he was part of the decision to fire Lipsky (Graham Dep. at 27) and Lipsky presented evidence that Ballard had a "vote" in this group decision as well (Lipsky Dep. at 22–23, 174). Thus, a jury could find that either or both Graham and Ballard were decision-makers in Lipksy's termination.

Turning to the second question, whether the decision-makers were motivated by age bias, discriminatory terms uttered by decision-makers may constitute direct evidence that age was the "but for" cause of the adverse employment decision. *See Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 425–26 (7th Cir. 1992) (noting that direct evidence of age discrimination

---

[1] While a party may not rely on inadmissible hearsay to avoid summary judgment, *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011), Stevens was involved in the decision-making process and delivered to news to Lipsky that his employment was being terminated. (Declaration of Jim Stevens ¶¶ 10–11, Docket # 31.) Thus, his statement to Lipsky is admissible as an admission by a party-opponent under Fed. R. Evid. 801(d)(2)(D). *See Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) ("For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to the decision-making process affecting the employment action.").

can include "discriminatory statements uttered by the employer's decision-maker"). Lipsky does not allege that Vandaelle discriminated against him. However, he does allege that Graham and Ballard expressed age-based animus towards him. Material facts are in dispute on this allegation. Lipsky testified that both Graham and Ballard repeatedly told him that he was "too old" to do the work and should consider retirement. (Lipsky Dep. at 28, 32–33, 42–49.) Lipsky also testified that both Graham and Ballard made derogatory statements to him regarding his age, such as calling him "Old Man" (*id.* at 32–33, 42–49) and a "fucking old miner" (*id.* at 164). Lipsky also testified that Graham gave him an ultimatum to either leave the Ohio Project and go to a project in Texas, or to retire. (*Id.* at 29–30.)

Graham and Ballard dispute these allegations. While Graham admits that he asked Lipsky about his retirement plans, he testified that it was done in the context of getting to know Lipsky and seeing if he would be interested in future jobs with Michels. (Graham Dep. at 50–51.) Graham denies calling Lipsky a "fucking old miner." (*Id.* at 54.) Similarly Ballard, contrary to Lipsky's assertions, denies asking Lipsky about retirement or ever talking to Lipsky about his age. (Yellin Decl. ¶ 4, Deposition of Mark Ballard ("Ballard Dep.") at 69, 70, Ex. 2, Docket # 28-2.)

In sum, Lipsky has presented sufficient evidence that if believed, shows that Graham and Ballard had discriminatory animus toward him. Although Michels disputes Lipsky's version of events, I cannot resolve these factual issues on summary judgment; rather, a jury must resolve these issues after full presentation of the evidence at trial. *See Parker v. Fed. Nat. Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984). For these reasons, Michels' motion for summary judgment is denied.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 25) is **DENIED**.

**IT IS FURTHER ORDERED** that the clerk's office will contact the parties to set a telephone conference regarding further scheduling in this case.

Dated at Milwaukee, Wisconsin this 17th day of January, 2020.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge